## Leonard N. Watson v. Louisa Thurber and others.

There is no legal objection to the making by a wife of a mortgage to secure her husband's debts.

Under the act of 1855 (*Comp. L. p.* 966) a wife can make such a mortgage of her own estate in the same manner and with the like effect as if unmarried. And an acknowledgment apart from the husband is not now requisite where a married woman conveys or encumbers her own estate.

A married woman gave a mortgage of her own lands to secure a debt of her husband. The testimony showed that it was given with reluctance, and after a good deal of persuasion by her husband, and at first she declined to acknowledge it; but the officer testified that she finally made an acknowledgment in the usual form, and she afterwards freely admitted its validity to one who had purchased it. On bill filed to foreclose it, she defended on the ground that it was obtained by undue influence or coercion. *Held*, that the defense was not made out by the evidence.

*Heard July 13th. Decided July 15th.*

Appeal in Chancery from Ingham Circuit.

The bill was filed to foreclose a mortgage given by said Louisa Thurber on her sole property, to secure a debt of Caleb Thurber, her husband. The mortgage bore date January 6, 1857, and its acknowledgment was taken by John Marble, a justice of the peace, who certified that she acknowledged separate and apart from her husband, that she had executed it freely, and without fear or compulsion of any one. A decree of foreclosure having been taken by default, Mrs. Thurber afterwards obtained an order opening the decree, and giving her leave to defend. She then filed her answer, in which she admitted the making of the mortgage, but alleged that the same was signed by her under protest that she did not execute the same freely, and only after the assurance of Watson and her husband that her property and rights therein should not be disturbed in consequence of the making thereof. In reference to this defense the following evidence was taken.

Louisa Thurber, the defendant, testified: "At the time of the execution of the mortgage, Mr. Watson and John Marble were present; the mortgage was given for the

purpose of securing the payment of a debt due by Mr.
Thurber to Mr. Watson, of about one hundred and fifty
dollars; the debt was for money loaned Mr. Thurber; I
do not remember when the loan was made; I first knew
of the existence of the indebtedness about the time the
mortgage was given; Mr. Thurber told me of it; the way
he came to tell me of it was this: he had got some
money of Mr. Watson, and had given him a mortgage of
his own property to secure the payment of it; I learned
that it had been given from Thurber and Mr. Watson both;
Mr. Watson brought it back; it did not suit him in some
way; when Mr. Thurber told me of the indebtedness, he
asked me to sign a mortgage on my property; this was the
same day the mortgage was executed; Mr. Thurber had
never asked me to give this mortgage previous to that day
that I remember of; I do not recollect whether any
person was present when he asked me to give the mort-
gage; I think no one was present; don't know in which
room it was; when he asked me to sign the mortgage
I told him I did not think Mr. Watson needed a mort-
gage on my property, and I was utterly opposed to
giving it; Mr. Thurber urged me very hard to give it,
and told me if I would my property should not be touched
for it; I still refused to sign it; I did not say I would
not execute it; the conversation about the execution of
the mortgage commenced in the forenoon; they came to our
house, I should think, about 8 or 9 o'clock in the morn-
ing; after I told Mr. Thurber I did not want to sign the
mortgage, he and Mr. Watson urged me very hard to
execute it; I once told Mr. Watson I would not sign
it; I do not remember what reply he made to this; he
talked to Mr. Thurber a spell; Mr. Watson and myself,
at the time he was urging me to sign the mortgage,
were in the sitting room; Mr. Thurber thought that rather
than to have a quarrel with the neighbors, I had better
sign the mortgage, and I did so; I suppose he meant

Mr. Watson by neighbors that he spoke of; he did not say who would make the disturbance, but I took it to be Mr. Watson he meant; I think Mr. Watson did not come back again, but cannot say for certain; there was a good deal said that I can't remember; I think Mr. Thurber and Mr. Watson each came to talk with me about it alone; I do not remember of any person being there except Mr. Marble; they stayed till they worried me out, teasing me to execute this mortgage; Mr. Thurber did the most of the talking with me about it; the reason he gave me for signing it was that he should have a disturbance and would be made trouble; do not know that he gave any other reasons; he told me he would pay it up without my having any trouble about it; I think the debt was to be paid within a year; Mr. Thurber had more than one conversation with me about it; I remember his taking me into the other room to talk about it as many as three times, and I refused to sign it; this was a room adjoining the one where Mr. Watson was; the reason I gave Mr. Thurber for not signing the mortgage was that I did not want my property endangered; I told Mr. Watson I did not want to sign it, as I had a family of small children and was afraid my property would be taken for it, and leave them destitute; Mr. Watson said he did not think there was any danger, as he thought Mr. Thurber would be able to pay it up; he said he should not be in any hurry for the money; he said the money did not belong to him, and he would not be in any hurry for it; I urged Mr. Watson to take the security Mr. Thurber had given him, and let my property be; I signed the mortgage, I think, as late as noon, and perhaps later; I cannot tell the time; I refused a long time to sign it, and did not say at all I would do it; Mr. John Marble took the acknowledgment of the mortgage; Mr. Marble asked me if I executed it freely of my own accord; I told him I did not; he asked me again;

he might have worded it a little different,—I can't remember; I told him the second time I had not done it freely; Mr. Marble dropped the mortgage upon the table, and said: Mr. Watson, it is n't worth a straw; I do not remember the reply Mr. Watson made to this; Mr. Marble then asked me if I did it through fear of Mr. Thurber; I told him I did not do it because I was afraid of Mr. Thurber,—that I did it more to keep peace in the family; I do not know what Mr. Marble then said to me; Mr. Marble asked me some other question, but what it was I cannot tell; I was so excited at the time I did not remember it; Mr. Watson said he would risk it; I do not recollect of anything further; the parties soon after separated; I am still the owner of the premises described in the mortgage, and in the occupation of them; I should not have said that I did not say I would not execute the mortgage, for I remember now that I did tell them both several times that I would not sign it; my statement above that I did not say that I would not execute it is incorrect; Mr. Watson was present when Mr. Marble asked me if I executed it freely; I cannot say whether Mr. Thurber was present or not, but it seems to me he was sitting by the window; at no time during the taking of the acknowledgment was I alone with Mr. Marble; Mr. Watson, I am sure, was present, and think Mr. Thurber was too; Mr. Thurber gave as a reason why my property should not be touched that he would pay the debt; I understood that if the debt was not paid Mr. Watson could foreclose the mortgage, and sell my property if he was a mind to; I do not know that Mr. Thurber told me what trouble he meant when he urged me to sign it, but I understood it to be in relation to the borrowed money. When I signed the mortgage mentioned in the bill of complaint, I expected it to go into Mr. Watson's hands for the purpose of securing the loan."

Caleb Thurber testified: "I was present at the execu-

tion of the mortgage to Watson; I was present at the time of the taking the acknowledgment by Doctor Marble; I do not remember that I was out of the room at any time during the examination of Mrs. Thurber by Mr. Marble in reference to the execution of the mortgage: Mr. Watson was also present; this mortgage was given for my debt; I heard the conversation between Mr. Marble and Mrs. Thurber and Mr. Watson, at the time the acknowledgment was taken; I heard the questions propounded by Mr. Marble to Mrs. Thurber in reference to the acknowledgment; Mr. Marble asked her if she executed the paper freely; her reply was that she did not do it freely; I think the Doctor asked her if she was afraid of me the reason she did not execute it freely, and she replied that she could not say that she was afraid of me, or something to that effect; I think the next move that was made the Doctor threw the paper on the table and said that it was not worth a straw; there were some remarks made by the Doctor and Mr. Watson; Mr. Marble was delicate about acknowledging the mortgage; there was some argument about it between them. Mr. Watson finally said if he would execute the acknowledgment he would risk it; I do not know as anything more was done or said; Mrs. Thurber appeared a good deal excited during the time the negotiations were going on; Mrs. Thurber executed the mortgage at the solicitation of myself and Mr. Watson; there was a good deal said, and it took a good deal of persuasion on our part to get her to do it; from the time I proposed to her to sign the mortgage until she did sign it, I should think it was three hours. One reason she gave why she would not sign the mortgage was that Mr. Watson already had a mortgage on my property sufficient to secure him; another was that she did not want to have her property incumbered; Mr. Watson and myself both told her she should not be hurt for the debt; I told her she should not have the

debt to pay, and Watson told her he did not think there was any danger of her having it to pay; when I said I was present at the taking of the acknowledgment of the mortgage, I meant I was in the same room. This room is in the south-east corner of the house fronting the street. During the time of the conversation of taking the acknowledgment, I was sitting on the lounge, as near as I remember; I think I was sitting with my face towards the table where they were doing the business; I might have been walking the floor some of the time for aught I know; I was called out occasionally to tend bar, and I might have been out a part of the time; the previous mortgage given by me to Mr. Watson was given up when the last papers were executed; from the time I first proposed to Mrs. Thurber to sign the mortgage up to the time she did sign it, there were several intervals in the conversation with her about it; we were not talking to her all the time about it; I was called off sometimes to tend bar; I had no other object in getting her to execute that mortgage than to secure the loan; I do not think Mrs. Thurber signed the note accompanying the mortgage; I was present when she signed the mortgage, and saw her sign it; I do not wish to be understood when I said I was out of the room a part of the time that I was out when the acknowledgment was taken; I was present all the time of the taking the acknowledgment."

John Marble testified: "I am the justice of the peace who took the acknowledgment of the mortgage mentioned in Mrs. Thurber's testimony; I was present during most of the conversation between the parties that has been related in the previous testimony; there are but few points that I remember distinctly in the conversation; I was called by Mr. Watson to go to Okemos to take the acknowledgment of a mortgage; the mortgage was drawn up after we got there; whether it was before or after

the signing that some difficulty arose about the acknowledgment, I cannot state; there was hesitancy on the part of Mrs. Thurber to make the requisite acknowledgment; I asked the usual questions; I put the questions several times in consequence of this hesitancy; I stated to the parties that it was necessary to have a direct answer, yes or no, otherwise I should have nothing to do with it; Mrs. Thurber hesitated for some time to answer directly yes or no; stated that she thought the giving the mortgage was unnecessary, and she did not do it willingly; I then asked whether I should suspend the business where it was, or whether she could answer the questions in the affirmative; I read the form of the acknowledgment; after a good deal of hesitancy she gave an explicit answer,— the answer as recorded on the acknowledgment of the mortgage; my impression is that from the time of the first conversation about the acknowledgment up to the time the business was completed, was about an hour and a half or two hours; Mrs. Thurber seemed laboring under considerable embarrassment at the time; more than under ordinary circumstances; my impression was that she was very loth to make the requisite acknowledgment; she did not seem bewildered, but somewhat excited; I do not remember that she gave her reasons for not wishing to acknowledge the mortgage; when I say I put the usual questions, I mean the usual questions put upon an acknowledgment by a married woman; her answer was as recorded in the acknowledgment; I can say, independent of that, that it was in the affirmative; if an examination separate and apart from her husband means in his absence from the room, I can not state positively that this examination was; my memory does not serve me whether he was in the room or not; I am not willing to say whether he was or not; I saw Mrs. Thurber sign the mortgage; can't say whether she signed the note in my presence or not; I should be likely to take the acknowledgment when Mr.

Thurber was out of the room, but I cannot say whether he was out or not; I do not remember."

Leonard N. Watson testified that he had the mortgage filled out by Mr. Marble. "I got him to go to Okemos the next morning to take the acknowledgment; we went into the bar room; Mr. Thurber made the remark that he had not spoken to his wife about it, but that it would be all right, and that he would go and see her; he was gone from the bar room some little time, and when he returned he said his wife declined giving a mortgage; I made the remark that he ought to have seen her before, and saved me the trouble of coming there; he said, 'you are not in a hurry,' and told me to wait a while, and when she had thought of it a little perhaps she would give the mortgage; after a while he came in and invited me into the sitting room; I went with him and he introduced me to his wife, and told me we could talk it over better there; I told her of the conversation with Mr. Thurber the night before, and told her if she would sign the mortgage I would feel secure, and that was all I asked; she still objected; said the place was hers, and that she did not mean to give any more mortgages on it; some further conversation passed, and Mr. Thurber and myself returned to the bar room. I told them both while in the sitting room, that I thought it was the best thing for them and me too, for them to give me the mortgage. After a while Mr. Thurber said he would go and see her again about it. He went out of the bar room, and was gone a short time, and when he returned said, 'get your justice and take the acknowledgment, she has concluded to give you the mortgage.' I went and got the justice, and we all went into the sitting room. As we went in she said, 'I am going to sign it, but not willingly.' There was no reply made to that remark. She sat by the table with the mortgage before her; I stepped up to the table and directed her where to sign it. She

signed her name, and then Mr. Thurber signed it. Previous to her signing it, we called in Lorenzo Watson to witness it. The witness then signed, and then the justice took it and asked the usual question on acknowledgment. The first time he asked her she made some kind of an evasive answer; what it was I can not say, but not to the satisfaction of the justice. The justice told her that he wanted her to answer his question direct, whether she signed of her free will without fear or compulsion from any one. She said, 'yes, I don't know that I do it from any fear or compulsion from any one.' This is all that I now recollect that took place before the mortgage was delivered to me. I do recollect further, that while we were in the sitting room the first time, Mr. Thurber said he would be able to pay the mortgage in a year. I made the remark that that would probably be as soon as I should want it, and perhaps sooner, as I intended that money to buy a certain lot of land as soon as it should come into market· She replied that if I did not want it before, to let the mortgage be that I had. I told her that I did not feel secure; that if I had thought it was good security I would not have come to get another; that all I wanted was to be secure. I think I made the remark when Mr. Thurber said he would be abundantly able to pay in a year, that if he did there would be no trouble on the mortgage. My opinion is that I did not at any time during the transaction say that in my opinion Mr. Thurber would be able to pay it in a year; I think I did not. The money loaned belonged to me. I did not state during that transaction that the money was not mine, and that I should not be in any hurry for it. I did not have any interview with Mrs. Thurber other than I have stated, previous to her giving the mortgage. The first time I heard that Mrs. Thurber made any complaint about signing the mortgage was when the notice was served on me of her application to open the decree in this case. The other mortgage I

afterwards gave up to Mr. Thurber. The premises were advertised upon the decree in this case. The sale was adjourned twice at the request of Mr. Thurber. The first time he gave as reason that he could not raise the money by the day of sale, but he expected to get some of a Dutchman. Myron W. Barnes came to see me about it for Mr. Thurber. Mr. Thurber came to me the second time, and said there would be no doubt if I could give him further time but that he would get it, for if he did not get it of the Dutchman, Mr. Smith talked of getting it for him. Mr. Smith did raise the money. Smith paid the money to me on the day of sale under the last adjournment, and I assigned the decree over to Mr. Smith; think it was on the 27th day of August, 1859. Smith paid me the full face of the decree and costs. I got to Mr. Thurber's on the day the mortgage was given, I should think between 8 and 10 o'clock in the forenoon; we were there about an hour and a half. The first time Mr. Thurber went to see Mrs. Thurber about giving the mortgage, I should think he was gone about 20 minutes; the time he went to see her about it the last time, he was gone 5 or 10 minutes; we were in the sitting room talking about it 10 or 15 minutes. At the time of the signing of the mortgage, Lorenzo Watson, John Marble, myself, Mrs. and Mr. Thurber were present. Mr. Thurber was present when the mortgage was executed, but whether he was when her acknowledgment was taken, or not, I can not say. The signing and the acknowledgment were about one and the same transaction; the acknowledgment was taken very soon after the execution; I am unable to determine whether Mr. Thurber was in the room at the time her acknowledgment was taken, or not. He was passing out and in during the time of the transaction; I did not see that Mrs. Thurber was laboring under any excitement at the time, except that she appeared to be a little riled at me. The only reason I remember she gave, why she did not want to sign the mortgage, was that the

property was hers, and she did not wish to incumber it any more. I had no previous conversation or acquaintance with Mr. Thurber. I did not threaten Mr. and Mrs. Thurber with any trouble or disturbance in case the mortgage was not given; I did not say or do anything, from which, in my opinion, could be drawn any such inference."

The following evidence was given in relation to the purchase by Smith:

Myron W. Barnes, testified: "I heard the testimony of Mr. Watson, given to-day. I am the Barnes spoken of by him as going to him from Thurber, to get a sale adjourned; I went at Mr. Caleb Thurber's request; I had something to do in relation to that sale after that, at Mr. Thurber's request. He requested me to find some person that had some money to lend him to pay this mortgage to Mr. Watson. I went to Morrison to get the money, and he had not got it. Thurber came to me after that, and gave me a dollar to pay me for my time, and requested me to go to Geo. M. Smith's, and get him and go to Mr. Watson's, and see what arrangement could be made about the postponement of the sale. I did so. Smith and I went to Mr. Watson's together. Mr. Watson said he was willing to accommodate Mr. Thurber, but that he was in need of fifty dollars very much; that he would sell the mortgage. Smith and myself then went directly from there to Mr. Thurber's. It was along in the evening when we got there. We went into the dining room. Mr. and Mrs. Thurber were there. Mr. Smith told them he would try to raise the money, and purchase the mortgage, if it was a good mortgage, and would give them some time on it. Mr. and Mrs. Thurber both stated that Watson's mortgage was a good mortgage. Mrs. Thurber stated that William Hinman had a mortgage on the premises, but that it was not a good one; that she did not sign it willingly; but that Watson's mortgage was a good mortgage, and if they could get the money to pay it up, they could get along."

Mr. Smith, testified: "Mr. Barnes came to me to go and see Mr. Watson, and I went with him to Mr. Watson's, as stated by Mr. Barnes. I told Mr. Watson that if he would postpone the sale, I would try to raise the money, and would have the mortgage assigned to me. Mr. Watson said all he wanted was the money. I remember of going to Mr. Thurber's, as stated by Mr. Barnes. Mr. Watson at the time we saw him, agreed to postpone the sale. At. Mr. Thurber's, Mr. Barnes told Mr. and Mrs. Thurber that we had got Mr. Watson to postpone the sale, so that I could raise the money. I asked them if it was a good mortgage, and told them if it was I would have it assigned to me; and they said it was a good mortgage, and Mr. Watson ought to have his pay. In the conversation it was stated between them that if they could get money to pay this mortgage, they could beat Hinman out of his mortgage; that she did not sign Hinman's mortgage willingly. Which one of them said this I can not tell. I recollect Mrs. Thurber said she did not sign Hinman's mortgage willingly. The day before the sale I got the money. On the day of sale I came to Lansing, where the sale was to be, and Mr. and Mrs. Thurber were there. I told them I had got the money, and would have the mortgage assigned to me, and would give them a year's time, and asked Mrs. Thurber if it was all right, and she said it was. I paid the money over to Mr. Watson within twenty minutes or half an hour after, and took an assignment from him. I paid him two hundred and sixty-one dollars and forty-three cents. I paid what I supposed to be the full face of the decree. I think this was the 27th of August, 1859. I let the sale go down. I waited the year before I made any further move. I then caused the premises to be advertised for sale. When the year was nearly out, I heard that Mrs. Thurber had commenced proceedings against Mr. Watson, to defend the mortgage. That was the first I had ever heard that Mrs.

Thurber found any fault with the mortgage. I think I charged them twenty-nine dollars for my trouble and services; I have never received anything back, of the money I paid Mr. Watson. Thurber assigned to me a certificate for a deed of forty acres of land, to secure me for my services and trouble, but I found it would cost more to redeem it than it was worth, and I let it go."

*J. W. Longyear*, for complainant:

The statute requiring the acknowledgment of the wife to be separate, &c., from the husband, has no application to conveyances by her of her separate property: — *Fisk v. Stubbs*, 30 *Ala.* 335; *Blood v. Humphrey*, 17 *Barb.* 660.

A mere unwillingness on her part will not vitiate her execution of the mortgage. There must have been a coercion or control of her will practiced upon her by duress or otherwise.

Even if the mortgage was voidable for the causes alleged, Mrs. Thurber has affirmed it by her subsequent conduct, in such a manner that honesty and fair dealing require that she should not now be permitted to avoid it:—*Fulton v. Moore*, 25 *Penn. St.* 468; *Needles v. Needles*, 7 *Ohio St.* 432.

*S. L. Kilbourne*, for Mrs. Thurber:

The evidence sufficiently establishes that the execution of the mortgage was obtained by coercion:—*Louden v. Blythe*, 16 *Penn. St.* 532; 2 *Washb. Real Pr.* 560.

If the wife is allowed to pledge her property for the husband's debts, her mortgages for that purpose must be free from *symptoms* of fraud, coercion, or undue influence: *Hollis v. Francois*, 5 *Texas*, 195; *Sampson v. Williamson*, 6 *Texas*, 102; 3 *Johns. Ch.* 550.

CAMPBELL J.:

The defense in this case is based upon the claim that the mortgage which was given by Mrs. Thurber on her

own property (her husband joining with her) as security for his debt was not fully executed and acknowledged. There is no legal objection to the making by a wife of a mortgage to secure her husband's debts. And under the act of 1855, a wife can make such a mortgage in the same manner and with the same effect as if unmarried. The peculiar acknowledgment formerly required is not now requisite where she conveys her own estate.

We do not think the defense of undue influence or coercion made out. Making every allowance for the facility offered by the marriage relation of using against the wife a degree of influence not possible in most other cases, we do not think a comparison of the testimony on both sides justifies us in assuming that Mrs. Thurber signed the mortgage against her own free will in the proper sense of the term. She was reluctant, but her reluctance was not, we think, so extreme as to show that it was improperly overcome. Her subsequent statements to Mr. Smith freely admitting the validity of the mortgage are not consistent with any theory of improper conduct in her husband or Mr. Watson.

Decree affirmed, with costs.

MANNING and CHRISTIANCY JJ. concurred.

MARTIN CH. J. was absent.